UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

DAVID DEPIETTO

                     Debtor.

-------------------------------------------------

RIDGEWOOD SAVINGS BANK,

                    Creditor-Appellant,

    v.

DAVID DEPIETTO,

                    Debtor-Appellee.

No. 20-CV-8043 (KMK)

ORDER

Appearances:

Michael C. Manniello, Esq.
Roach & Lin, P.C.
Syosset, NY
*Counsel for Creditor-Appellant*

Henry B. Bronson, Esq.
Bronson Law Offices PC
Harrison, NY
*Counsel for Debtor-Appellee*

KENNETH M. KARAS, District Judge:

      Creditor-Appellant Ridgewood Savings Bank ("Ridgewood") appeals from the August 25, 2020 Order of the Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), which confirmed the Chapter 11 Amended Plan of Reorganization (the "Plan") of Debtor-Appellee David DePietto ("Debtor"). (Appellant's Br. Ex. 1 ("App."), at 352 (Dkt. Nos. 11, 11-1).) For the reasons set forth below, the Court remands the case to the Bankruptcy Court.

## I. Background

### A. Factual Background

#### 1. Debtor's Default and Plan of Reorganization

On June 27, 2007, Debtor executed a note (the "Note") evidencing a debt to Ridgewood. (Appellant's Br. 2; App. 171.) Under the terms of the Note, Debtor agreed to pay a principal amount of $788,000.00, plus interest (the "Loan Amount"). (App. 171.) The Note provides that "[i]nterest will be charged on unpaid principal until the full amount of [p]rincipal has been paid." (*Id.*) Debtor was to make monthly payments toward principal and interest beginning on August 1, 2007. (*Id.*) The maturity date of the Note is July 1, 2037. (*Id.*) As security for the Note, Debtor executed a mortgage to Ridgewood in the amount of $788,000.00. (Appellant's Br. 2; App. 177.) The mortgage places a lien on the premises known as 22 Walbrooke Road in Scarsdale, New York, which serves as Debtor's primary residence. (Appellant's Br. 2; App. 6, 181, 208.) The mortgage secures no other property. (Appellant's Br. 2.)

On March 8, 2019, Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code. (*Id.*; App. 4.) On June 26, 2019, Ridgewood filed a Proof of Claim in the amount of $1,074,619.27. (Appellant's Br. 2; App. 138.) That amount included pre-petition mortgage arrears in the amount of $474,366.82 (the "Pre-Petition Arrears"), which arose from Debtor's default in making regular monthly mortgage payments to Ridgewood beginning in March 2013. (Appellant's Br. 2; App. 138, 140–44.) No objection was filed to Ridgewood's Proof of Claim. (Appellant's Br. 2.)

On July 8, 2020, Debtor filed his Amended Plan of Reorganization (the "Plan") as part of his Amended Disclosure Statement. (*Id.*; App. 52–90.) Under the Plan, Debtor would cure his default by paying the full amount of Pre-Petition Arrears over the remaining life of the loan,

making monthly payments of $2,326.00 until the loan matures in 2037. (Appellant's Br. 2–3; App. 81.) Excluding Pre-Petition Arrears, the outstanding balance on the loan ("Outstanding Balance") was $501,493.29. (*See* App. 81.)¹ The Plan would allow Debtor to continue paying off the Outstanding Balance at the contract rate of $6,397 per month, "or such amount as adjusted from time to time based upon interest fluctuations." (App. 81; *see also* Br. for Appellee ("Appellee's Br.") Ex. 1 ("Confirmation Tr."), at 9:17–21 ("Under the Debtor's plan, the Debtor proposes to cure the defaults on the Ridgewood Mortgage, to pay those defaults in regular prorated monthly payments during the remaining term of the mortgage loan, and also to continue to perform the mortgage loan according to its terms.") (Dkt. Nos. 14, 14-1).)² Under the Plan's scheme for classifying and prioritizing creditor claims, the Pre-Petition Arrears and Outstanding Balance together make up Class 2A. (*See* App. 81.) The Plan treats the claims in Class 2A as unimpaired, meaning that Ridgewood, the holder of these claims, was "not entitled to vote to accept or reject the Amended Plan." (*Id.*)

On August 17, 2020, Ridgewood filed objections to the Plan and the Amended Disclosure Statement. (*See* Bankr. Dkt. Nos. 45–46.)³ In challenging the Plan, Ridgewood relied on 11 U.S.C. § 1123. (*See* App. 167–68.) Under this provision, a plan of reorganization may "modify the rights of holders of secured claims," but only to the extent such a claim is not "secured only by a security interest in real property that is the debtor's principal residence." 11 U.S.C. § 1123(b)(5). Because Ridgewood's claim is secured exclusively by the mortgage on

---

¹ The Plan refers to the Outstanding Balance as the "Allowed Amount." (App. 81.)

² The "Confirmation Transcript" refers to the transcript of a hearing held before the Honorable Robert D. Drain ("Judge Drain") on August 24, 2020.

³ Citations to "Bankr. Dkt." refer to Bankruptcy Docket No. 19-22590 in the Bankruptcy Court for the Southern District of New York.

Debtor's principal residence, § 1123(b)(5) protects its claim from modification. *See id.* (*See also* App. 167–68.) Ridgewood argued that by failing to provide for interest accruing on the principal component of the Pre-Petition Arrears over the remaining 17-year life of the mortgage, the Plan "does in fact seek to modify [its] claim in violation of [§] 1123." (*Id.* at 167 (describing the Plan as "simply tak[ing] the [Pre-Petition] [A]rrears and divid[ing] them over the remaining life of the mortgage").) Ridgewood acknowledged that the Pre-Petition Arrears "sought to be cure[d] over the life of the Amended Plan already have monthly interest built in," and, in this sense, "[a]rgument could be made" that Ridgewood was seeking impermissible "interest on interest." (*Id.* at 168–69.) Ridgewood maintained, however, that the "interest component" contained in the Pre-Petition Arrears "is insufficient to make [it] whole." (*Id.* at 169.) As Ridgewood explained, the Pre-Petition Arrears also "contain a principal component on which [it] is entitled to interest" until the principal is fully repaid. (*Id.*) Thus, it argued, the interest to which it is allegedly entitled would not be "interest on interest," but rather "additional interest on principal to compensate [Ridgewood] for the cure of the [P]re-[P]etition [A]rrears occurring over the 204 months." (*Id.*)

Besides arguing that the Plan runs afoul of 11 U.S.C. § 1123, Ridgewood also argued that the Plan "incorrectly treats [Ridgewood's] claim as unimpaired," thereby preventing it from voting to accept or reject the Plan. (*See id.* at 167.) Under 11 U.S.C. § 1124, a claim is considered "impaired" unless a plan of reorganization either (i) "leaves unaltered the legal, equitable, and contractual rights to which such claim" entitles the claimholder, 11 U.S.C. § 1124(1), or (ii) satisfies specific requirements for curing a default, *see id.* § 1124(2)(A)–(E). For the reasons just stated, Ridgewood argued that the Plan did alter its contractual rights. (App. 166 ("[The Plan] would certainly impair [Ridgewood's] claim as the arrears would not be fully

cured.").) Ridgewood also apparently believed that the Plan does not satisfy the cure requirements set forth in 11 U.S.C. § 1124(2)(A)–(E). (*See id.* at 165–69, 249–51.)

Debtor responded to Ridgewood's objections on August 20, 2020. (Bankr. Dkt. No. 48.) On August 21, 2020, in preparation for the confirmation hearing, counsel for Debtor filed a Certification of Ballots ("Certification") indicating the outcome of the vote to approve the Plan. (Bankr. Dkt. No. 50; App. 342–43.) As the Certification indicated, Class 1 and Class 2B were deemed unimpaired and therefore unentitled to vote. (App. 342.) In view of the dispute over whether the claims in Class 2A were unimpaired, Ridgewood was given a provisional ballot. (*Id.*) Ridgewood's ballot—which voted to reject the Plan—would only be counted if the Bankruptcy Court ultimately concluded that Ridgewood's claims were impaired. (App. 342–43.) Finally, of the two impaired claims in Class 3, one ballot—cast by an individual named Ira Gorsky—voted to accept the Plan. (*Id.* at 343.) The Certification stated that because one impaired class voted in favor of the Plan, it could be confirmed pursuant to 11 U.S.C. § 1129(a)(10). (*Id.*)

### 2. August 2020 Confirmation Hearing

On August 24, 2020, the Bankruptcy Court held a confirmation hearing. (*See generally* Confirmation Tr.) At the hearing, Judge Drain noted that the Plan "provides for payment of [Ridgewood's] allowed claim in full by curing the accumulated pre-confirmation default." (*Id.* at 4:14–16.) "[I]n addition to paying those [Pre-Petition Arrears] over the life of the loan," he added, the Plan also provides that Debtor will "pay[] the contract-rate mortgage obligation through the life of the loan." (*Id.* at 4:16–18.) As Judge Drain explained, the Plan's treatment of Ridgewood's claim is based on 11 U.S.C. § 1124(2), which "provides that a claim, such as [Ridgewood's] claim in this case, is impaired, and therefore entitled to vote," *unless* the plan:

5

> (A)  cures any . . . default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in [§] 365(b)(2) of this title or of a kind that [§] 365(b)(2) expressly does not require to be cured;
>
> (B)  reinstates the maturity of such claim or interest as such maturity existed before such default;
>
> (C)  compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law;
>
> (D)  if such claim or such interest arises from any failure to perform a non-monetary obligation, other than a default arising from failure to operate a non-residential real property lease subject to [§] 365(b)(1)(A), compensates the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and
>
> (E)  does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

(*Id.* at 6:5–7:7 (quoting 11 U.S.C. § 1124(2)(A)–(E)).)  Judge Drain pointed out that the Second Circuit, interpreting an equivalent provision under Chapter 13, has "held . . . that a [d]ebtor can deaccelerate a loan and cure it under the equivalent of [§] 1124." (*Id.* at 7:8–13 (citing *In re Taddeo*, 685 F.2d 24 (2d Cir. 1982).)  "That logic," he added, "has been applied to chapter 11 cases, as well, repeatedly." (*Id.* at 7:13–16 (citing *In re LaPorta*, 578 B.R. 792 (N.D. Ill. 2017)).)

Judge Drain also discussed two additional provisions that are relevant to Ridgewood's argument that it is entitled to receive additional interest on the principal component of the Pre-Petition Arrears.  (*See id.* at 7:18–8:23.)  First, 11 U.S.C. § 502(b)(2) "disallows claims for unmatured interest, [that is,] post-petition interest." (*Id.* at 7:18–20.)  Although 11 U.S.C. § 506(b) provides an exception for oversecured claims, *see* 11 U.S.C. § 506(b) (allowing post-petition interest "[t]o the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such

claim"), Judge Drain observed that "[h]ere, based on the undisputed value, [Ridgewood's] claim is substantially under secured," and thus, "[§] 506(b) would not apply," (Confirmation Tr. 8:2–5). Thus, "except with respect [to] [§] 1124"—which, as noted, sets forth the requirements for curing a default—"[there is] no independent right to post-petition interest." (*Id.* at 8:4–5.) The second relevant provision is 11 U.S.C. § 1123. (*See id.* at 8:6–23.) Section 1123(a)(5)(G) explicitly provides that a plan of reorganization may "cur[e] or waiv[e] . . . any default" to effectuate the plan's implementation, *see* 11 U.S.C. § 1123(a)(5)(G), and § 1123(d) provides that if a plan proposes such a cure, "the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law, *id.* § 1123(d). As Judge Drain pointed out, Congress enacted § 1123(d) to abrogate the Supreme Court's decision in *Rake v. Wade*, 502 U.S. 151 (1991), where the Court, "in connection with a cure attempt under a plan by a [d]ebtor, imposed a noncontractual cure rate," that is, a cure rate that "was not provided for in [the] [parties'] agreements or under applicable non-bankruptcy law." (Confirmation Tr. 8:24–9:5.)

      Here, although the Note does provide for a two percent charge on principal and interest for each late payment, (*see id.* at 9:25–10:1; *see also* App. 173), it "does not provide for interest on interest, and the law of New York does not provide for it under set circumstances," (Confirmation Tr. 9:22–24). Relying on *In re Adejobi*, 404 B.R. 78 (Bankr. E.D.N.Y. 2009), and *In re Kizzac Management Corp.*, 44 B.R. 496 (Bankr. S.D.N.Y. 1984), Judge Drain concluded that because the two percent charge is set forth in the Parties' agreement, "it is clearly provided for under [§] 1123(d), and therefore[] would be required . . . under [§] 1124 as an element of the calculation of the arrears." (*Id.* at 10:5–16.) Based on the same authority, however, Judge Drain found that the additional amount sought by Ridgewood—which he described as the "additional

7

lost opportunity cost or cost of money"—was *not* necessary to cure Debtor's default and render Ridgewood's claim unimpaired under § 1124(2).  (*See id.* at 10:23–11:1.)  In other words, because this additional amount was not "provided for in the [P]arties' agreement," it was not part of the amount necessary "to render [Ridgewood's claim] unimpaired."  (*Id.* at 11:3–6.)  After preliminarily confirming Debtor's Plan on the record at the August 24 hearing, (*see id.* at 12:21–13:14), Judge Drain formally confirmed the plan in an order entered on August 25, 2020, (*see* Bankr. Dkt. No. 54).

    B.  Procedural History

Ridgewood filed its Notice of Appeal on September 29, 2020.  (Dkt. No. 1.)  On October 22, 2020, Ridgewood filed a designation of items to be included in the record on appeal, but failed to include "a statement of the issues to be presented," as required by Rule 8009 of the Federal Rules of Bankruptcy Procedure.  Fed. R. Bankr. P. 8009(a)(1)(A).  (*See* Dkt. No. 3.)  On November 5, 2020, counsel for Debtor requested a two-week extension to file its counterstatement of the issues and counter-designation of the record on appeal.  (Dkt. No. 5.)  Debtor's counsel indicated that Ridgewood expected to file a statement of issues no later than November 6, 2020.  (*Id.*)  Although Ridgewood did file such a statement, it did so only on the Bankruptcy Court docket.  (*See* Bankr. Dkt. No. 67; Dkt.)  The Court granted Debtor's request for an extension, (Dkt. No. 6), and, on November 24, 2020, Debtor filed its counterstatement of issues and counter-designation of the record on appeal.  (Dkt. No. 7.)  On the same day, the Court granted Ridgewood and Debtor's joint request to extend the deadline for filing their respective briefs.  (Dkt. Nos. 9–10.)  Ridgewood filed its brief on December 15, 2020, (Dkt. No. 11), Debtor filed his brief on January 28, 2020, (Dkt. No. 14), and Ridgewood filed its Reply brief on February 11, 2021, (*see* Appellant's Reply (Dkt. No. 16)).

8

II.  Discussion

A.  Standard of Review

The Court has jurisdiction to review this appeal pursuant to 28 U.S.C. § 158(a)(1).  *See Dishi & Sons v. Bay Condos LLC*, 510 B.R. 696, 700 (S.D.N.Y. 2014).  "This Court 'may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings.'"  *In re Bernard L. Madoff Inv. Sec., LLC*, No. 15-CV-1151, 2016 WL 183492, at *8 (S.D.N.Y. Jan. 14, 2016), *aff'd*, 697 F. App'x 708 (2d Cir. 2017).[4]  A district court reviews a bankruptcy court's conclusions of law de novo, its discretionary decisions for abuse of discretion, and its findings of fact for clear error.  *See In re Bayshore Wire Prods. Corp.*, 209 F.3d 100, 103 (2d Cir. 2000).  Under the clear error standard, "there is a strong presumption in favor of a trial court's findings of fact if supported by substantial evidence," and a reviewing court will not upset a factual finding "unless [it is] left with the definite and firm conviction that a mistake has been committed."  *Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1574 (2d Cir. 1994) (citation, alteration, and quotation marks omitted).  "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."  *Id.* at 1574–75 (citation and quotation marks omitted); *see also UFCW Local One Pension Fund v. Enivel Props., LLC*, 791 F.3d 369, 372 (2d Cir. 2015) (same).

B.  Analysis

On appeal, Ridgewood again argues that the Plan impermissibly excuses Debtor from paying interest on deferred principal from the Pre-Petition Arrears.  (*See* Appellant's Br. 4–5, 8–9.)  Here, as with any amortizing loan, Debtor's monthly payments under the Note contain both

---

[4] While the quoted language, formerly found in Rule 8013, is no longer contained in the Federal Bankruptcy Rules of Procedure, "logic still compels the same conclusion with respect to the appellate powers of the District Court."  *In re Madoff*, 2016 WL 183492, at *8 n.14.

principal and interest components. (*See* App. 141–44; Appellant's Br. 8.) Thus, the monthly payments on which Debtor defaulted—the Pre-Petition Arrears—"each contain[ed] a principal component on which Ridgewood is entitled to interest." (Appellant's Br. 8.) The Plan, as discussed, seeks to cure the Pre-Petition Arrears by having Debtor pay them off in pro rata portions over the remaining life of the loan. (*See* Confirmation Tr. 4:14–16, 9:17–20; App. 81.) Although Ridgewood acknowledges that the Pre-Petition Arrears "sought to be cured over the life of the [loan] already have monthly interest built in," it argues that this "interest component is insufficient to make [it] whole." (Appellant's Br. 8.) In other words, Ridgewood maintains that it is entitled to "additional interest" "on the principal component of the [Pre-Petition] [A]rrears . . . to compensate [it] for the cure of th[ose] . . . arrears occurring over the [remaining life of the loan]." (*Id.* at 8–9.)

Although Ridgewood frames its argument around the Plan's treatment of Pre-Petition Arrears, (*see id.* at 5, 8–9), it also could have approached this argument from a different angle, by focusing on the Plan's treatment of the Outstanding Balance. It is rudimentary that, under an amortization schedule such as the one that determines Debtor's monthly payments, (*see* App. 141–44), the amount a borrower pays in monthly interest depends on the outstanding principal amount; as the principal diminishes, so does the amount paid in monthly interest, *see, e.g.*, *Carrillo v. Wells Fargo Bank, N.A.*, No. 18-CV-3095, 2019 WL 3714801, at *5 (E.D.N.Y. May 10, 2019) ("The amortization of any loan is axiomatic to the interest being charged, in that the repayment calculation is necessarily derived from the interest accruing on the principal."). Here, as discussed, the Plan allows Debtor to pay off his defaulted payments over the remaining life of the loan. (*See* App. 81.) What this means, of course, is that some portion of the principal component of the Pre-Petition Arrears will remain outstanding through the duration of the loan.

10

As Ridgewood acknowledges, Debtor will pay *some* interest on this principal amount: Because his defaulted payments had "monthly interest built in," by paying the Pre-Petition Arrears, Debtor will pay the amount of monthly interest that was due at a previous point in the amortization schedule. (*See* Appellant's Br. 8.) But as Ridgewood also observes, (*see id.*), the Note provides that "[i]nterest will be charged on unpaid principal until the full amount of [p]rincipal has been paid," (App. 171). Thus, Ridgewood would argue that, to the extent there is outstanding principal from previous defaulted payments, this principal should be factored into the Outstanding Balance amount, such that Debtor would continue to pay interest on this residual principal through the duration of the loan. The Plan, however, does not appear to make this adjustment. As the Court understands the Plan, the Outstanding Balance of $501,493.29 is the amount that remains on the loan *after* the Pre-Petition Arrears (and all prior payments) are deducted from the Loan Amount. (*See* App. 81.) That is, the Outstanding Balance does not include any of the residual principal component from the Pre-Petition Arrears. Thus, to the extent such principal remains outstanding through the life of the loan, the Plan does not require Debtor to continue paying interest on it. In this sense, the Plan allows Debtor to continue performing the loan obligation—i.e., to pay the Outstanding Balance—as though the Pre-Petition Arrears had already been paid in full, when in reality he is paying these amounts simultaneously until the loan's maturity date. Stated differently, the Plan prevents Debtor's defaulted payments from having a domino effect within the amortization schedule. Although a series of defaulted payments would ordinarily cascade through the amortization schedule and cause higher subsequent interest payments (to account for a higher outstanding principal balance), the Plan effectively cabins the damage from Debtor's default. The Plan requires Debtor to make up his defaulted payments by paying the Pre-Petition Arrears, but, at the same time, it allows him to

finish performing the loan obligation consistent with the original payment schedule. (*See* Confirmation Tr. 4:17–18 (observing that the Plan allows Debtor to "pay[] the contract-rate mortgage obligation through the life of the loan"); *id.* at 9:20–21 (observing that Debtor is allowed "to continue to perform the mortgage loan according to its terms").) Ridgewood argues that this feature of the Plan constitutes "a modification of [its] rights which should not be permitted." (Appellant's Br. 5.)

Turning to the relevant law, § 1124(2) provides that, despite "any contractual provision or applicable law that entitles [a creditor] to demand or receive accelerated payment . . . after the occurrence of a default," the creditor's claim will be left unimpaired so long as the debtor's reorganization plan meets certain requirements. 11 U.S.C. § 1124(2). Specifically, the debtor's plan must (i) "cure[] [the] default"; (ii) "reinstate[] the maturity of [the creditor's] claim or interest as such maturity existed before [the] default"; and (iii) "compensate[] the [creditor] for any damages incurred as a result of [the creditor's] reasonable reliance . . . on such contractual provision or such applicable law." *Id.* § 1124(2)(A)–(C). Just as important, the plan may "not otherwise alter the legal, equitable, or contractual rights to which [the creditor's] claim or interest entitles [it]." *Id.* § 1124(2)(E); *see also In re Sultan Realty, LLC*, No. 12-10119, 2012 WL 6681845, at *8 (Bankr. S.D.N.Y. Dec. 21, 2012) (explaining that in order to satisfy § 1124(2), a plan must, "[a]mong other things, . . . reinstate the original maturity date of the accelerated debt, cure all defaults, compensate the creditor for its damages[,] and not otherwise alter its legal, equitable[,] or contractual rights").[5] Here, Ridgewood does not claim that the Plan fails to

---

[5] Section 1124(2)(D) provides that if the creditor's claim or interest "arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to [§] 365(b)(1)(A)," the debtor's plan must "compensate[] the [creditor] . . . for any actual pecuniary loss incurred by [it] as a result of such failure." 11 U.S.C. § 1124(2)(D). This provision has no application in the instant matter.

reinstate the Note's maturity as this "maturity existed before [Debtor's] default." *Id.* § 1124(2)(B). (*See generally* Appellant's Br.) Ridgewood's argument instead hinges on some combination of the remaining prongs of § 1124(2). At bottom, Ridgewood believes that the amount Debtor pays under the Plan is insufficient to cure his underlying default.

Although "[t]he Bankruptcy Code does not define 'cure,'" *In re Liberty Warehouse Assocs. Ltd. P'ship*, 220 B.R. 546, 548 (Bankr. S.D.N.Y. 1998), the Second Circuit analyzed the meaning of this term in *Di Pierro v. Taddeo (In re Taddeo)*, 685 F.2d 24 (2d Cir. 1982), which remains "a leading case" on the topic, *In re Adejobi*, 404 B.R. at 80; *see also In re Phoenix Business Park Ltd. P'ship*, 257 B.R. 517, 519 (Bankr. D. Ariz. 2001) (calling *Taddeo* "the seminal case on cure"). Interpreting a Chapter 13 provision similar to § 1124, the Second Circuit held in *Taddeo* that a debtor's power to "cure defaults" allows mortgagors to "de-accelerate" their mortgage and reinstate their original payment schedule. 685 F.2d at 26–27. (*See also* Confirmation Tr. 7:8–16 (discussing *Taddeo*).) The court observed that "[a] default is an event in the debtor-creditor relationship which triggers certain consequences," such as acceleration. 685 F.2d at 26. "Curing a default," the court explained, "commonly means taking care of the triggering event and returning to pre-default conditions[,]" such that "[t]he consequences are thus nullified." *Id.* at 26–27. "This is the concept of 'cure' used throughout the Bankruptcy Code." *Id.* at 27. In the years since *Taddeo* was decided, courts in the Second Circuit have continued to invoke its rationale when evaluating a debtor's proposed cure. *See, e.g.*, *In re Etienne Ests. at Washington LLC*, No. 14-40786, 2016 WL 1254739, at *10 (Bankr. E.D.N.Y. Mar. 30, 2016) (citing *Taddeo* and explaining that a cure under § 1124(2) "return[s] the debtor and creditor to the status quo ante—that is, the position that they would have occupied had the default not occurred" (italics omitted)); *In re Weatherell*, No. 10-10123, 2010 WL 3938225, at *3 (Bankr.

D. Vt. Sept. 29, 2010) (invoking *Taddeo* for the proposition that a cure restores parties to the status quo ante); *In re NextWave Pers. Commc'ns Inc.*, 244 B.R. 253, 268 (Bankr. S.D.N.Y. 2000) (relying on *Taddeo* for the proposition that a "cure" under § 1124(2) effectuates a "'reversal' of the event that triggered the default and a return to a pre-default status quo"), *vacated on other grounds*, *In re FCC*, 208 F.3d 137 (2d Cir. 2000) (per curiam).

Also relevant in evaluating Ridgewood's argument is § 1123(d), which provides that, "if it is proposed in a plan to cure a default[,] the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law." 11 U.S.C. § 1123(d). As noted above, Congress enacted § 1123(d) to abrogate the Supreme Court's decision in *Rake*, which held that a debtor's cure under Chapter 13 "entitled the creditor to receive interest on the defaulted payments, including interest on interest, regardless of whether it was required or permitted by the parties' agreement or state law," *In re Sultan Realty, LLC*, 2012 WL 6681845, at *9. A number of courts, including several within the Second Circuit, have concluded that § 1123(d) may require the debtor to pay a default interest rate in order to cure a default. *See Pacifica L 51, LLC v. New Invs. Inc. (In re New Invs., Inc.)*, 840 F.3d 1137, 1139 (9th Cir. 2016) (holding that "allowing a curing debtor to avoid a contractual post-default interest rate in a loan agreement is no longer valid in light of § 1123(d)"); *In re Moshe*, 567 B.R. 438, 444 (Bankr. E.D.N.Y. May 11, 2017) ("Courts interpreting [§] 1123(d) have held that the underlying loan agreement and state law determine whether a debtor must cure using the default rate of interest in a Chapter 11 plan" (gathering cases)); *In re Gen. Growth Props., Inc.*, 451 B.R. 323, 327 (Bankr. S.D.N.Y. 2011) (observing that § 1123(d) "certainly does not preclude the payment of default interest").

14

In confirming the Plan, the Bankruptcy Court properly considered both *Taddeo* and § 1123(d).  With respect to the former, Judge Drain observed that the Second Circuit's "logic" in *Taddeo* had "been applied to chapter 11 cases . . . repeatedly," citing *LaPorta* as an example.  (Confirmation Tr. 7:13–16.)  On appeal, Ridgewood argues that *LaPorta* was wrongly decided, and suggests that a debtor's ability to cure a default is more limited under Chapter 11 than under Chapter 13.  (*See* Appellant's Br. 6–7.)  At issue in *LaPorta* was whether the Bankruptcy Code "permits deceleration of an accelerated mortgage debt and concomitant reinstatement and curing" under Chapter 11, just as it does under Chapter 13.  (*Id.* at 6.)  Ridgewood "submit[s] that the court in *LaPorta* mashed the [B]ankruptcy [C]ode provisions addressing Chapter 13 and Chapter 11 plans to create a hybrid not intended by Congress when enacting those provisions and not generally accepted throughout the United States."  (*Id.*)

This argument is meritless.  As Judge Drain's ruling suggested, *LaPorta*'s conclusion—that "cure, reinstatement[,] and maintenance of a defaulted mortgage loan is permitted in Chapter 11" no less than in Chapter 13, *see* 578 B.R. at 794—is no outlier.  Before arguing to the contrary, Ridgewood might have consulted *Taddeo* itself, where the Second Circuit stated explicitly that "'curing a default' in Chapter 11 means the same thing as it does in Chapters 7 or 13: the event of default is remedied and the consequences are nullified."  685 F.2d at 29.  Even a cursory scan of relevant case law from within the Second Circuit confirms that courts have repeatedly extended *Taddeo*'s rationale in the Chapter 11 context.  *See, e.g.*, *In re Etienne Ests.*, 2016 WL 1254739, at *10 (invoking *Taddeo* and applying its principles to a debtor's proposed cure under Chapter 11); *In re NextWave*, 244 B.R. at 268 ("Although *Taddeo* was a Chapter 13 case, its holding applies with equal force in the Chapter 11 context, as the language in both Chapters is substantially similar."); *In re Kizzac Mgmt. Corp.*, 44 B.R. at 500 n.8 ("Although

15

*Taddeo* was a chapter 13 case, the principles enunciated therein have been held to apply equally in a chapter 11 reorganization." (gathering cases)); *Levy v. Forest Hills Assocs. (In re Forest Hills Assocs.)*, 40 B.R. 410, 414 (Bankr. S.D.N.Y. 1984) (noting that "[a]lthough *Taddeo* involved a Chapter 13 debtor, the Second Circuit Court of Appeals likened [§] 1322(b) to [§] 1124," and applying *Taddeo*'s principles to a debtor's proposed cure under Chapter 11).  That *Taddeo*'s holding applies to a proposed cure under Chapter 11 is beyond dispute.  Although Ridgewood argues that this approach is "not generally accepted throughout the United States," (Appellant's Br. 6), it provides no support for this assertion.[6]  That is an understandable omission, for courts around the country have in fact concluded that a debtor's ability to cure a default under Chapter 11 is at least as extensive as it is under Chapter 13.  *See, e.g.*, *Midlantic Nat'l Bank v. DeSeno (In re DeSeno)*, 17 F.3d 642, 643–44 (3d Cir. 1994) (recognizing that § 1123 of Chapter 11 and § 1322 of Chapter 13 "are parallel provisions," and stating that "Congress' understanding of the authorization to cure defaults in each was identical" (citation omitted)); *Great W. Bank & Tr. v. Entz-White Lumber & Supply, Inc. (In re Entz-White Lumber & Supply, Inc.)*, 850 F.2d 1338, 1340 n.1 (9th Cir. 1988) (invoking *Taddeo* and explaining that, "[a]lthough Chapter 13 restricts allowable cures in ways that Chapter 11 does not, the underlying concept of cure is the same throughout the Bankruptcy Code"), *abrogated on other grounds by In re New Invs., Inc.*, 840 F.3d 1137; *In re Madison Hotel Assocs.*, 749 F.2d 410, 422 (7th Cir. 1984) (treating a debtor's ability to cure a default under Chapter 11 as identical to the same ability under Chapter 13); *see also, e.g.*, *Related Partners Props., Inc. v. PNC Cornerstone, Inc.*

---

[6] Although *LaPorta* itself did not reference *Taddeo*, the court there relied on *In re Lennington*, 288 B.R. 802 (C.D. Ill. 2003), which invoked *Taddeo* for the proposition that the "right to cure in Chapter 11 means the same thing as in Chapter 13, where a prepetition arrearage may be paid over a reasonable period," *id.* at 805.

*(In re Related Partners Props., Inc.)*, 163 B.R. 213, 216 n.4 (S.D. Fla. 1993) ("This [c]ourt . . . agrees with the holding in *In re Taddeo* . . . , that the plain language authorizing cure in Chapter 11 . . . is 'similar to' that of Chapter 13 and the concept of cure 'means the same thing' in both Chapters.").

With respect to § 1123(d), Judge Drain observed that although the Note does not provide for interest on interest, it does provide for a two percent late charge on principal and interest. (Confirmation Tr. 9:22–10:4; *see also* App. 173.) Invoking *Adejobi*, where the court held that the amount necessary to cure a Chapter 13 debtor's pre-petition arrears included interest at the default rate, *see* 404 B.R. at 80, Judge Drain concluded that Pre-Petition Arrears here "should include the two percent late charge through the date of confirmation," explaining that, "[it is] that amount[,] prorated[,] that needs to be paid" in order to cure Debtor's default, (Confirmation Tr. 10:5–7). Although *Adejobi* involved a default interest rate, *see* 404 B.R. at 80, Judge Drain observed that "a late charge is in essence post-default interest," (Confirmation Tr. 10:10). In view of *Adejobi*, among other cases, the Court agrees that the two percent late charge set forth in the Parties' agreement constitutes a necessary part of the cure amount. *See In re New Invs., Inc.*, 840 F.3d at 1141 ("The plain language of § 1123(d) compels the holding that a debtor cannot nullify a preexisting obligation in a loan agreement to pay post-default interest solely by proposing a cure."); *In re Moshe*, 567 B.R. at 446 ("[I]n proposing a Chapter 11 plan, a debtor cannot disregard [§] 1123(d) and cure a default under [§] 1124(2) by paying the arrears at the non-default rate of interest.").

This still leaves the question, however, of whether Debtor must pay additional interest on the principal component of the Pre-Petition Arrears that will remain outstanding through the duration of the loan. Having closely examined the Bankruptcy Court's ruling below, the Court

finds that Judge Drain did not clearly address this question when confirming the proposed Plan. As Ridgewood notes, (*see* Appellant's Br. 8–9), Judge Drain appears to have interpreted Ridgewood's argument (at least in part) as a request for interest-on-interest. Having discussed the relevant law, for example, Judge Drain observed that the Note "does not provide for interest on interest." (Confirmation Tr. 9:22–23.) Similarly, a few moments later, Judge Drain invoked the *Kizzak* decision and observed that Ridgewood appeared to be seeking "additional lost opportunity cost or cost of money." (*Id.* at 10:17–11:1.) In *Kizzak*, though, the court held only that certain creditors were "not entitled to interest on defaulted . . . mortgage *interest* payments." 44 B.R. at 500 (emphasis added). The creditors in that case argued that by "fail[ing] to pay interest on the pre-petition interest in addition to principal arrearages," the plan in question "fail[ed] to compensate them for any damages incurred as a result of any reasonable reliance on any acceleration clause or other applicable law." *Id.* (quotation marks omitted). Stated differently, "their argument [was] that interest on the aggregate overdue installments [was] necessary to replace their 'lost opportunity costs,' i.e., profits that could have been made by investing timely paid interest installments." *Id.* It is not entirely clear from the opinion whether the plan actually provided for interest on the *principal* component of the pre-petition arrearages; the creditors were challenging only the plan's failure to provide for interest on the *interest* component of the arrearages. *See id.*[7] In resolving the creditors' challenge, the court relied on a

---

[7] The fact that the creditors, the debtor, and the court only focused on the plan's failure to pay interest on interest arguably suggests that the plan *did* provide for interest on the underlying principal component of the pre-petition arrearages. *See* 44 B.R. at 499 ("[The creditors] contend that the second mortgage cannot be cured and reinstated in accordance with Code § 1124(2)(C) unless they receive interest on all unpaid pre-petition arrears of interest *as well as principal* under the second mortgage" (emphasis added)); *id.* at 500 (explaining that the creditors were challenging the plan's "failure to pay interest on the pre-petition interest *in addition to principal arrearages*" (emphasis added)). Moreover, the debtor in the case did not appear to argue that creditors were not entitled to interest on the principal component of the arrearages. *See id.* at 499

pair of related decisions "dealing with interest on interest," *id.*, ultimately concluding that such payments were not recoverable under New York law, *see id.* at 502. With respect to the creditors' alleged lost opportunity cost—i.e., the damages they allegedly suffered "by not being able to invest timely paid installments of interest"—the court found that such "'loss' [was] not the type of compensatory damages contemplated by § 1124(2)(C)." *Id.* at 501 (citation omitted). Although Judge Drain interpreted Ridgewood's objection as a request for "additional lost opportunity cost or cost of money," invoking *Kizzak* as guidance, (Confirmation Tr. 10:23–24), Ridgewood—unlike the creditors in *Kizzak*—is not (and was not) asking for interest on the *interest* component of the Pre-Petition Arrears, (*see* Appellant's Br. 8–9; App. 168–69). *Kizzak* did not address the issue Ridgewood raises—whether it is entitled to interest on the *principal* component of the Pre-Petition Arrears—and Judge Drain, in relying on *Kizzak*, did not address this distinction. In short, the Bankruptcy Court did not squarely address the issue this Court is now called upon to resolve.

To the extent Judge Drain either overlooked this very particular distinction, or simply failed to make his finding more explicit, the Court is sympathetic to such an oversight. As the discussion above indicates, Ridgewood has not framed the issue as clearly as it might have, and, as Judge Drain noted on the record, he was being asked to resolve certain legal questions in the abstract, without having a detailed view of relevant calculations and data. (*See* Confirmation Tr. 11:7–10 ("I gather from both sides of this dispute that it is not clear for today's record how the claim is determined, what the components are, and indeed that the right to object to the claim is preserved[.]").) Before resolving Ridgewood's appeal, however, the Court will remand this

---

("[The debtor] asserts that the [creditors] are not entitled to interest on defaulted *interest* payments under the second mortgage pursuant to its terms or pursuant to New York law." (emphasis added)).

matter in order for the Bankruptcy Court to address the specific question of whether Ridgewood is entitled to additional interest on any outstanding principal component of the Pre-Petition Arrears through the remaining duration of the loan. *See, e.g.*, *Hyde Park v. DeFlora Lake Dev. Assocs., Inc. (In re DeFlora Lake Dev. Assocs., Inc.)*, ---B.R.---, 2021 WL 1191988, at *4 (S.D.N.Y. Mar. 29, 2021) ("Where the record does not reflect the reasoning for the bankruptcy court's decision, the Court may remand for further proceedings." (citation and quotation marks omitted)).

### III.  Conclusion

Accordingly, Ridgewood's appeal is denied without prejudice, and this matter is remanded to the Bankruptcy Court for additional consideration of the legal issue identified above.  Ridgewood may renew its appeal pending the Bankruptcy Court's determination.

The Clerk of Court is respectfully directed to remand this case and close the appeal.

SO ORDERED.

Dated:   August 2, 2021
         White Plains, New York

_____
KENNETH M. KARAS
United States District Judge